## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **ESTATE OF MELVIN NOBLE, JR.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00716** |
| | § | |
| **RAY GENE BOLLIN, JR. d/b/a** | § | |
| **ABSOLUT PRODUCTION** | § | |
| **RECORDING STUDIOS, and PURLIE** | § | **Jury Trial Demanded** |
| **GATES a/k/a "P.G."** | § | |
| | § | |
| **Defendants.** | § | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT
### AND REQUEST FOR PERMANENT INJUNCTION[1]

Plaintiff, the Estate of Melvin Noble, Jr., by and through its undersigned attorney, respectfully alleges as follows for its first amended complaint against Defendants, Ray Gene Bollin, Jr. d/b/a Absolut Production Recording Studios and Purlie Gates a/k/a "P.G."

### PARTIES

1.      Plaintiff Estate of Melvin Noble, Jr. (the "Estate") is the legal owner and successor of the rights and interests of award-winning rap music artist, investor, entrepreneur, and philanthropist Melvin Abdul Noble Jr., professionally known as "Mo3." Probate of the Estate is taking place under the jurisdiction of the Collin County Probate Court No. 1 in McKinney, Texas (the "Probate Court").

2.      Defendant Ray Gene Bollin, Jr. ("Bollin") a/k/a/ "Drop" and d/b/a Absolut Production Recording Studios is an individual believed to be residing in Dallas County, Texas. On

---

[1] The Estate files its Emergency Application for Temporary Restraining Order and Preliminary Injunction contemporaneously with filing this Amended Complaint.

information and belief Bollin may be served at his last known address at 5954 Broadway Boulevard, Apt. 130, Garland, TX 75043, or 9817 Walnut Street, Apt. 102, Dallas, Texas 75243, or wherever he may be found.

3.    Defendant Purlie Gates a/k/a P.G. ("P.G.") is an individual believed to be residing in Denton County, Texas.  On information and belief, P.G. may be served at his last known address at 2604 Misty Harbor Drive, Little Elm, TX 75068, or wherever he may be found.

## NATURE OF THE CLAIMS

4.    This is an action for declaratory judgment and ancillary relief arising under the copyright laws of the United States, 17 U.S.C. §§ 101, *et seq.*; Rule 57 of the Federal Rules of Civil Procedure; and 28 U.S.C. § 2201.  As alleged herein, a real, substantial and immediate controversy is presented regarding the rights, liabilities, status and legal relations of the parties in connection with the authorship and ownership of various musical compositions and sound recordings. Declaratory relief, as requested herein, is necessary to preserve rights that otherwise may be lost or impaired, and is intended to terminate controversy and remove uncertainties between the parties.

5.    In addition to the foregoing, the Estate brings federal claims for copyright infringement and violation of the Digital Millennium Copyright Act; and pendent state law claims for breach of contract, conversion and unauthorized use of name, likeness and voice under TEX. PROP. CODE § 26.013.

6.    Further, the Estate brings claims for temporary and permanent injunctive relief, as described more fully below and in the Estate's contemporaneously filed Application for Temporary Restraining Order and Preliminary Injunction.

## JURISDICTION AND VENUE

7.     The court has subject matter jurisdiction over this action under 17 U.S.C. §§ 101, *et seq.* (actions arising under the copyright laws); 28 U.S.C. §§ 1331 (federal question), 1338 (exclusive original jurisdiction over copyright claims). The Court has supplemental jurisdiction over the Estate's state law claims under 28 U.S.C. § 1367(a).

8.     Venue is proper in the Eastern District of Texas, Sherman Division under 28 U.S.C. § 1391(b)(2) because this district and division are where a substantial part of the events giving rise to the claims occurred, including the authorship of the musical compositions at issue and the probate of the Estate.  Venue is also proper under 28 U.S.C. § 1400 because Defendants may be found in this District.

## BACKGROUND FACTS

**A.     Melvin Abdul Noble Jr. p/k/a Mo3's career.**

9.     Melvin Noble, Jr. ("Noble") was an acclaimed North Texas hip-hop artist from McKinney, Texas whose career was cut tragically short when he was murdered in November 2020. Noble was known for his hard-knock success story and vast musical talent as a rapper, singer, songwriter, actor, producer, and entrepreneur.

10.     In 2013, Noble released his debut single "*Hold Ya Tongue*," which garnered him widespread attention as an up-and-coming Texas hip-hop artist. The video for "*Hold Ya Tongue*" has been viewed almost 10 million times on YouTube.

11.     Noble leveraged his musical achievements into a popular record label, "H$M Music," and several other lucrative ventures that helped establish "Mo3" as one of the most recognized and valuable brands in the entertainment industry.

12.     Noble also achieved notable success as an actor and is featured in several motion pictures currently in production.

13.     Following his 2013 debut, Noble released several albums and numerous singles—all featuring his signature rhythm and blues singing and rap style. In 2019, Noble signed with Empire Distribution, Inc. ("Empire"), a San Francisco based record label whose artists include Snoop Dog and Kendrick Lamar. To date, Noble has sold more than one million records worldwide.

**B.      Ray Gene Bollin a/k/a "Drop" d/b/a Absolut Production Recording Studios.**

14.     Bollin, who is also known as "Drop," is an audio tech and owner of North Texas digital recording studio Absolut Production Recording Studios ("Absolut Studios").   Absolut Studios is not an organized entity.  Bollin operates Absolut Studios personally, as an unregistered d/b/a.

15.     For years, Noble used Bollin's studio to record Noble's vocal performances (the "Vocal Tracks") of his previously written musical compositions (the "Musical Compositions") over previously created instrumental tracks that Noble brought into the studio (the "Instrumental Tracks"). During recording sessions for the Vocal Tracks Bollin's role consisted solely of setting up a microphone and pushing the record button, and those purely technical tasks were performed under Noble's specific direction, guidance and control. After recording was complete, Bollin's digital music files containing the Vocal Tracks and Instrumental Tracks (the "Music Files") were either stored on Bollin's computer hard drives for later use or forwarded to other engineers for mixing and mastering.[2]  Bollin did not perform any mixing or mastering himself; and as mentioned, he had nothing to do with the creation of the Musical Compositions or Instrumental Tracks.

---

[2] "Mixing is when an engineer carves and balances the separate tracks in a session to sound good when played together. While mastering a song means putting the finishing touches on a track by enhancing the overall sound, creating

16.     Bollin was paid in full for each recording session, and over the course of his relationship with Noble, never once claimed any interest in Noble's musical works—that is, until he hatched a scheme to capitalize on the trove of Vocal Tracks stored on his computer hard drives.

**C.     Melvin Abdul Noble Jr.'s death.**

17.     In October 2020, Noble instructed his manager Brandon Rainwater ("Rainwater") to retrieve all of his Music Files from Absolut Studios. Bollin confirmed that Rainwater was welcome to do so; however, a series of tragic events derailed those efforts, and vested responsibility for the recovery of the Music Files in a court appointed administrator.

18.     On November 11, 2020, in the prime of his life and career, Noble was viciously gunned down on a freeway in Dallas, Texas. Noble was survived by his three children, ███████ ████████████████████████████████████████████████ his mother Nichole Noble ("Ms. Noble"), and his father Melvin Noble, Sr.

19.     On or about December 16, 2020, Noble's family filed an Application to Determine Heirship and for Letters of Independent Administration in Collin County Probate Court No. 1, McKinney, Texas, in the matter styled *In the Estate of Melvin Noble, Jr.*, PB1-1844-2020.  On December 17, 2020, the Probate Court issued Letters of Temporary Administration designating Daniel L. White, Esq. ("White") as Administrator. Among the powers granted to White was the power to carry on the operation of Noble's business, to take possession of all personal and business property, and to "identify, collect and preserve all of Decedent's intellectual property."

---

consistency across the album, and preparing it for distribution." Nick Messitte, *What Is the Difference Between Mixing and Mastering?*, Izotope (May 12, 2022), available at https://www.izotope.com/en/learn/what-is-the-difference-between-mixing-and-mastering.html (visited on Oct. 10, 2023).

**D.      Bollin's refusal to turn over Noble's Music Files.**

20.      After Noble's death, his family attempted to facilitate White's recovery of Noble's Music Files from Absolut Studios.  Initially, Bollin expressed sympathy for Noble's passing, and in February of 2021, confirmed that he had possession of the Music Files.[3] Bollin assured the Nobles that he wanted to return the Music Files to them, and invited Ms. Noble to Absolut Studios to take possession.[4]

21.      For several weeks, Ms. Noble and various family members tried repeatedly to contact Bollin to arrange a date for pick-up of the Music Files—even traveling to Absolut Studios—but to no avail. Bollin had disappeared.

22.      Weeks later, Bollin resurfaced—finally returning Ms. Noble's calls, and stating that he intended to turn the Music Files over to the Estate's Administrator instead of Ms. Noble. Bollin asked Ms. Noble to have the Administrator contact him directly.

23.      On or about March 17, 2021, Administrator White provided Bollin with the Probate Court's Order authorizing him to take possession of the Music Files, and asked him to comply with the Order.  In response, Bollin claimed to be represented by counsel and advised White that he would not turn over the Music Files unless subpoenaed to do so.  When White asked Bollin to provide him with the name and phone number of his "attorney," Bollin declined to do so.

24.      On or about March 25, 2021, White obtained a subpoena from the Collin County Probate Court ordering Bollin to appear in court and turn over the Music Files; however, all attempts to serve Bollin failed, who by all appearances was intentionally avoiding service.[5]

---

[3] At the time he contacted Ms. Noble, Bollin informed her that he held over 400 of Noble's recordings.
[4] On some occasions, Bollin suggested that the Music Files had either been lost or destroyed.
[5] Defendant Bollin was sent a copy of the subpoena by text message but refused to make himself available for service of the subpoena.

White's numerous subsequent attempts to obtain Bollin's voluntary compliance with the Probate Court's orders and subpoena also failed.

25.     In the summer of 2021, White initially was alarmed when he learned Bollin was attempting to sell some or all of the Music Files. But when White learned that Bollin had attempted to sell the Music Files to Empire, he was no longer concerned.  White understood that Empire was a reputable and sophisticated label that understands the legal ramifications of its business decisions.  White, through Finkley, was in communication with Empire during this time.

26.     On May 18, 2021, Bollin sent Ms. Noble a Mother's Day wish via text. Ms. Noble thanked him for the wish, but said "if you want to [make] me happy please give me my son's music. I am having to go through too much as is." Bollin responded "Peace Nichole. I would like to give you the files, however there is some unfinished business."

27.     In or around this same time, Bollin reached out to Noble's record company Empire, proposing a "sale" of a series of unreleased Mo3 recordings that he claimed to have in his possession (the "Unreleased Recordings").[6]  Initially, Bollin requested payment of studio fees that he claimed were outstanding in the amount of $10,000 to $20,000, and agreed to deliver the Unreleased Recordings if those fees were paid.  In reality, there were no fees owed because Noble paid Bollin in cash after each and every session, and in fact—Bollin never previously asserted any claims for unpaid studio fees to the Estate, or anyone else for that matter.

28.     In subsequent conversations with Empire, Bollin inflated his claims. In addition to claiming unpaid studio fees, he now claimed to be the "producer" of the Unreleased Recordings,

---

[6] It is not clear whether the Unreleased Recordings are simply the unfinished recordings featuring the Instrumental Tracks and Vocal Tracks that Noble was storing at Absolut, or if Bollin has added anything to those recordings. Whatever the case, Bollin had (and has) no right to commercially exploit and/or create derivative works featuring the Instrumental Tracks, Vocal Tracks or Musical Compositions, which do not belong to him and in which he holds valid copyrights.

and to have registered some or all of them with the U.S. Copyright Office.[7] Bollin then disappeared and was not heard from for months.

**E.     Bollin's shakedown of the Estate.**

29.     On April 13, 2022, Bollin's lawyer Raymond Mbala emailed Empire to propose a new round of discussions. Apologizing for the lengthy delay, Mbala requested a "face-to-face meeting with Empire in Dallas, Texas," and promised to "negotiate and finalize an agreement that [would] be mutually beneficial for all parties involved." Mbala noted that May 31, 2022 had been proclaimed "Mo3 Day in McKinney, Texas," and suggested a "joint release of a not-yet published Mo3 project on that date." Mbala concluded on a disingenuously upbeat note—affirming that his "client look[ed] forward to establishing and developing a working relationship with Empire to extend and uphold the legacy of such a talented artist and beloved friend." To the contrary, what Mbala was really proposing was the insertion of his client into a business deal in which he had no interest—either as an author or producer—and much less a "beloved friend."

30.     After reopening discussions, Mbala disappeared once again and was not heard from until August 2022. In the meantime, in late May 2022, the Estate negotiated and executed an amendment to Noble's recording agreement with Empire providing for the release of two-posthumous Mo3 albums that were (and are) intended to feature previously unreleased material—including selections from the Vocal Tracks and Musical Compositions.

31.     On August 24, 2022, Mbala resurfaced, apologizing for the "break in communication due to factors outside of [his] control." Mbala's correspondence suggested that he was aware of the amendment to Noble's recording agreement, and that he and his client smelled

---

[7] Documents filed with the U.S. Copyright Office reflect that between March 4, 2021 and June 6, 2021, Bollin did in fact submit copyright registration applications for at least 30 Unreleased Recordings—improperly identifying himself as the sole "author" with respect to 10 of them, and as Noble's "coauthor" for the remaining 20. Turman Dec. ¶ 2.  In all such applications, Bollin also falsely listed himself as the proper contact for rights and permissions. *Id.*

money. Mbala indicated that a business proposal was forthcoming and prefaced the offer with a statement regarding his client's "historical position as it relates to Empire's business dealings with Melvin Noble III, p/k/a 'Mo3.'" Mbala explained his client's "position" as follows:

> From a historical standpoint my clients would have preferred that the parties had come together prior to Empire investing in the signing, promoting, and mass distribution of Mo3 before securing any Master recordings. They are confident that this matter could have been resolved years ago with a simple phone call and a meeting. The appearance of a hasty decision to move forward with Mo3's project without engaging my clients has initiated a downward spiraling chain, and quite frankly, to my clients, it appears that there was an attempt to disregard Absolut after many years of hard work and sacrifice…. Now that we are at this point, my clients want to be fully compensated for all of Drop's[8]/Absolut's contributions to Mo3's career from the moment he walked into Absolut Productions Studios in the Fall of 2012 through the time he … signed, or otherwise became affiliated with Empire Records. To this end, in the coming days, I will be forwarding a proposed settlement structure that my clients hope will help move a deal between Absolut and Empire to finalization.

32.     Contrary to Mbala's grandiose characterizations, Bollin's role in Noble's career was miniscule—consisting of pushing a button to record Vocal Tracks over pre-recorded Instrumental Tracks that would later be mixed and mastered by engineers. More importantly, Bollin "sacrificed" nothing at all. He had already been fully compensated for his labor and was entitled to no further consideration.

33.     On September 19, 2022, Mbala finally presented Empire with a "deal memo" outlining his client's demands. Under the proposal, Bollin would purportedly "transfer" ownership of the Unreleased Recordings in exchange for the following:

- $20,820 for "production" (allegedly consisting of recording, mixing, mastering and arrangement) and studio time;

- $624,000 in "licensing fees" for 78 "previously released songs" and $6,500 per recording for the Unreleased Recordings (the quantity of which remained undisclosed)— plus a 25% royalty interest in all of the recordings;

---

[8] As discussed above, Bollin's alias is "Drop."

- "Back royalties" to be "paid retroactively from all sales, downloads, streaming platforms, etc." of the 78 previously released recordings; and

- Credits to include RIAA Certifications, production and engineering credits, recognition in press releases, and a co-writer's credit.[9]

34.     On September 23, 2022, Empire's in-house counsel Mike Gallegus requested a list of the Unreleased Recordings in Bollin's possession. Mbala responded on October 11, 2022, with a list of 51 "unreleased single recordings" advising that they had all been copyrighted by Bollin with "all rights reserved."[10] At $6,500 per recording (under the proposed deal memo), the list confirmed that Bollin sought an additional $331,500 for the Unreleased Recordings, or a total of almost $1 million, plus back royalties and future royalties.

**F.     Summary and recent developments.**

35.     Other than to request a track listing, Empire has not responded to Bollin's outrageous proposal, thereby prompting him to seek other avenues of opportunity.

36.     Most recently, Bollin and P.G., a man identifying himself as Bollin's "business manager" contacted Jasmine Moore (the mother of one of Noble's children)—attempting to gain her assistance in independently exploiting the Unreleased Recordings.

37.     Specifically, in late August 2023, Moore was contacted by "P.G.," which she understood to be short for "Purlie Gates." P.G. contacted Moore on behalf of Bollin. Moore and P.G. met at a restaurant in Richardson, Texas on August 24, 2023. P.G. brought a folder to the meeting with him.

38.     At the meeting, P.G. asked Moore to agree to release the rights to Noble's Vocal Tracks that P.G. and/or Bollin had in their possession. P.G. did not say how many tracks were in

---

[9] On information and belief, this was the first time Bollin had ever suggested he was a co-writer of the Musical Compositions—each of which were written before Noble stepped foot into Bollin's studio to record the Vocal Tracks therefor.

[10] Research suggests that only 30 of the Unreleased Recordings have been registered. *See* note 7, *supra*.

their possession, but he suggested it was a large number.  P.G. also asked Moore to agree to have both P.G. and Bollin named as writers and co-producers of the tracks in their possession.  P.G. also asked Moore to agree that P.G. and Bollin could release the Music Files so P.G. and Bollin could get paid for the music and so Moore's child could receive payments relating to the Music Files.

39.     P.G. said negative things about the people with authority to handle Noble's Estate, and he said that if P.G. and Bollin do not get to release the Music Files, "then no one will get" them.

40.     P.G. also said he was attempting to make this kind of deal with only Moore, and that Noble's other children (and their mothers) would not get any money if she agreed.  P.G. made it clear to Moore that, if she signed the document, then she and her son would not have to share the proceeds with Noble's other two children, their mothers, or anyone else with claims in Mr. Noble's Estate.  Shortly after Moore indicated she would not agree to P.G.'s proposal, he left.

41.     To characterize Bollin's elaborate scheme to capitalize on the Estate's assets as an "overreach" does the term no justice. At the end of the day, he is in opportunistic interloper, seeking a multi-million-dollar payday in exchange for recordings and music files that do not belong to him—some of which have been falsely registered at the U.S. Copyright Office in Bollin's name.

42.     The Estate brought this action for declaratory relief, injunctive relief, and damages.

43.     On information and belief, the Music Files are unfinished—meaning that they have not been professionally mixed, produced and mastered; and are therefore not suitable for commercial release.  If Bollin were to release even a portion of the unfinished Music Files (or license them to others for release), it would jeopardize the popularity and marketability of Noble's

existing recordings and brand.  Additionally, Bollin has permitted others to use the Instrumental Tracks previously accompanied with Noble's Vocal Tracks.  Allowing multiple artists to use the same instrumental track would result in the tracks competing and, thus, diminish the value of the version featuring Noble's vocal performance.  It would be impossible to compute the diminution in commercial value that could be caused by Bollin's wrongful acts.

44.     The Music Files and Vocal Tracks – which Noble's Estate has the right to control – are not safe in Bollin's possession.

45.     Accordingly, due to Bollin's renewed efforts to circumvent the Estate and maintain possession of Noble's intellectual property, the Estate now seeks temporary and permanent injunctive relief to restrain Bollin's improper conduct.

### COUNT I: DECLARATORY JUDGMENT – AUTHORSHIP/OWNERSHIP

46.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

47.     Noble was the sole author and owner of the Vocal Tracks, and therefore the copyright owner of such works; which ownership has vested in the Estate through probate.

48.     Notwithstanding, Bollin—who acted solely as an audio tech under Noble's guidance, direction and control—has improperly asserted authorship, ownership and control of at least 51 Unreleased Recordings featuring the Vocal Tracks and is attempting to sell and/or directly exploit them for his own gain.

49.     A justiciable controversy therefore exists as to the rights, obligations, and status of the parties with respect to the Vocal Tracks, for which the Estate seeks remedy.

50.     Specifically, the Estate seeks a judicial declaration that (a) Noble was the sole author of the Vocal Tracks,[11] and (b) that the Estate has acquired Noble's copyright interests in the Vocal Tracks through probate.[12]

51.     In addition to the foregoing, Bollin claims a copyright interest in the Musical Compositions as a coauthor.

52.     The Estate contends that Bollin did not contribute in any way to the creation of the Musical Compositions and has no copyright interests therein as a coauthor.

53.     A justiciable controversy therefore exists as to the rights, obligations, and status of the parties with respect to the Musical Compositions, for which the Estate seeks a judicial declaration that Bollin has no authorship interests and/or copyrights.

## COUNT II:  BREACH OF CONTRACT

54.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

55.     The parties entered into an agreement whereby Noble paid Bollin to record Vocal Tracks under Noble's guidance, direction and control; and to store the Vocal Tracks and other Music Files until requested by Noble or his representatives.

56.     Noble performed under the agreement by paying for all services rendered.

57.     By his actions described above, Bollin has breached the agreement by (a) refusing to turn over the Vocal Tracks and Music Files, despite the Estate's demand therefor, (b) claiming authorship rights he does not possess, (c) claiming copyright ownership rights he does not possesses, and (c) demanding further payment for his services.

---

[11] For clarity, the Estate is not presently seeking any judicial declaration as to the authorship of the Instrumental Tracks or Unreleased Recordings.

[12] As ancillary relief, the estate also seeks a judicial declaration that the sound recording copyright registrations issued by the U.S. Copyright Office for the Unreleased Recordings were improperly registered in Bollin's name as author and/or coauthor, and should therefore be amended.

58.     Bollin's actions have proximately caused injury to the Estate in an amount to be proven at trial, which damages are continuing.  The Estate's damages include at least actual damages (including benefit of the bargain damages) and consequential damages.

## COUNT III: CONVERSION

59.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

60.     Defendant Bollin has exercised dominion, wrongfully withheld and converted to his use physical assets belonging to the Estate, including the Music Files.

61.     Bollin has continued to deprive the Estate of these assets, despite repeated demands therefor. Bollin's conduct has been both willful and malicious.

62.     As a result, in addition to recovery of its right of access to (and control over) the property at issue, the Estate is entitled to recover exemplary damages to deter similar conduct by Bollin and others.

## COUNT IV: COPYRIGHT INFRINGEMENT

63.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

64.     By his actions alleged above, Defendant Bollin (acting individually and/or by and through his agents and/or representatives) has infringed the Estate's federally registered copyrights.

65.     On information and belief, Bollin has copied and distributed one or more Unreleased Recordings featuring the Vocal Tracks and Musical Compositions for purposes of soliciting the sale thereof to one or more third parties, and in order to register the sound recording copyrights therein and thereto, and by doing so, has infringed the Estate's exclusive rights set forth in 17 U.S.C. § 106.

66.     In addition to, and/or in the alternative to committing direct copyright infringement, upon information and belief, Bollin is vicariously liable for any copyright infringement committed by his agents and/or representatives who copied and distributed the Unreleased Recordings because he had the right and ability to supervise and/or control the wrongful actions of those individuals, and stood to derive a direct benefit therefrom by selling the Unreleased Recordings to one or more third parties, and is therefore vicariously liable for copyright infringement.

67.     In addition to and/or in the alternative to committing direct copyright infringement and/or vicarious copyright infringement, Bollin has contributorily infringed the Estate's copyrights.

68.     Specifically, by retaining one or more agents to shop[13] the Unreleased Recordings, and providing the Unreleased Recordings to said parties to facilitate the same, Bollin induced, caused and/or materially contributed to their unauthorized copying and/or distribution of the Vocal Tracks and Musical Compositions.

69.     Bollin's actions constituted willful infringement of the Estate's copyrights inasmuch as he knew, or had reason to know, that his actions constituted copyright infringement because he knew that he had no authorship or ownership rights in the Vocal Tracks and Musical Compositions, and copied and distributed them anyway, for personal gain.

70.     As a result of the foregoing, the Estate is entitled to actual damages plus the profits earned by Bollin; and/or statutory damages of up to $150,000 per work infringed, plus attorney's fees and costs of court. 17 U.S.C. §§ 504, 505. Unfortunately, any breach and/or publication would result in diminishing the value of any unreleased recordings featuring Noble's vocal performance.

---

[13] Shopping means presenting artists [masters] to record companies with the goal of securing a music recording or music publishing agreement — the proverbial 'deal.'" Abdo, Kenneth J., *Shopping Record Deals for Lawyers: A&R Approach and Ethics Issues*, 23 ENTM'T & SPORTS LAW 3 (2005).

## COUNT V: DMCA CLAIM

71.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

72.     On information and belief, Defendant Bollin (acting individually and/or by and through his agents and/or representatives) violated Section 1202 of the DMCA by intentionally falsifying copyright management information with knowledge, or a reasonable basis to know, that his actions would induce, enable, facilitate, and/or conceal infringement. 17 U.S.C. § 1202.

73.     Specifically, Bollin filed applications for copyright registration falsely naming himself as sole author of ten Unreleased Recordings featuring the Vocal Tracks, and as coauthor of an additional twenty Unreleased Recordings featuring the Vocal Tracks.  Decl. of B. Turman ¶ 2.

74.     On information and belief, Bollin's actions were committed intentionally—for the purpose of enabling and/or facilitating Bollin's further infringement of the Estate's copyrights through the sale or transfer of the Unreleased Recordings to one or more third parties, including Empire.

75.     In addition to, and/or in the alternative to committing direct violations of the DMCA, upon information and belief, Bollin is vicariously liable for any direct violations of the DMCA committed by his agents and/or representatives who may have filed the copyright registration applications at issue because Bollin had the right and ability to supervise and/or control the wrongful actions of those individuals, and stood to derive a direct benefit therefrom by selling the Unreleased Recordings to one or more third parties, and is therefore vicariously liable for the violations of Section 1202 of the DMCA.

76.     As a result of the foregoing, the Estate is entitled to actual damages and any additional profits derived by Bollin; or in the alternative, statutory damages for each violation in

an amount no less than $2,500 and no more than $25,000, plus costs and attorney's fees. 17 U.S.C.

§ 1203(b)(4), (5) & (c).

## COUNT VI: UNAUTHORIZED USE OF NAME AND LIKENESS
## UNDER TEX. PROP. CODE § 26.013

77.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

78.     Melvin Noble's name, voice, and likeness (hereinafter, the "Noble Name and Likeness Rights") had significant commercial value at the time of his death, and that commercial value has only increased since his untimely passing.

79.     The Noble Name and Likeness Rights are presently being administered by Daniel L. White, Esq. on behalf of the Estate, in accordance with the powers vested in Mr. White by the Probate Court.

80.     Pursuant to TEX. PROP. CODE § 26.013, Defendant Bollin is liable to the Estate for use of the Noble Name and Likeness Rights in an unauthorized manner in connection with his efforts to exploit the Unreleased Recordings.

81.     As a result of Bollin's unauthorized use of the Noble Name and Likeness Rights, the Estate is entitled to recover the amount of any damages sustained, or $2,500, whichever is greater; the amount of Bollin's profits that are attributable to the unauthorized use; exemplary damages; and reasonable attorneys' fees, expenses and court costs. TEX. PROP. CODE § 26.013. Unfortunately, the Estate will suffer irreparable harm if Bollin, as well as those acting in concert with him, attempt to use Noble's name, likeness, or voice.

## COUNT VII: TORTIOUS INTERFERENCE

82.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

83.     The Estate has contractual and business relationships with Empire. Bollin and P.G. have knowledge of these agreements.

84.     However, Bollin and P.G. have intentionally interfered with the foregoing agreement by attempting to do an end-run around the Estate and reach an agreement with Empire regarding the Music Files, by maintaining possession of the Music Files without the Estate's authorization, and by seeking to obtain a release of rights from Ms. Moore.

85.     Bollin and P.G.'s tortious conduct proximately caused injury to the Estate.

86.     The Estate suffered actual damages and/or loss due to Bollin's and P.G.'s tortious interference, including the time and resources expended to respond to Empire's requests for information and lost time to monetize the Music Files for the benefit of the Estate's beneficiaries, among other things.

87.     Bollin and P.G. tortiously interfered with the contractual relations with malice, in that they had the specific intent to cause injury and/or harm to the Estate.  Moreover, their conduct is outrageous and reprehensible.

## COUNT VIII: AIDING AND ABETTING CONVERSION

88.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

89.     P.G. aided and abetted Bollin's conversion of the Estate's property.

90.     P.G., with unlawful intent, gave substantial assistance and encouragement to Bollin in Bollin's conversion of the Music Files.  Bollin's actions in which, on information and belief, P.G. participated are described more fully *supra*.

## COUNT IX: AIDING AND ABETTING COPYRIGHT INFRINGEMENT

91.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

92.     P.G. aided and abetted Bollin's infringement of the Estate's copyrights.

93.     P.G., with unlawful intent, gave substantial assistance and encouragement to Bollin in Bollin's infringement of the Estate's copyrights in the Music Files.  Bollin's actions in which, on information and belief, P.G. participated are described more fully *supra*.

### COUNT X: AIDING AND ABETTING UNAUTHORIZED
### USE OF NAME AND LIKENESS

94.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

95.     P.G. aided and abetted Bollin's infringement of the Estate's name and likeness rights.

96.     P.G., with unlawful intent, gave substantial assistance and encouragement to Bollin in Bollin's infringement of the Estate's name and likeness rights related to the Music Files. Bollin's actions in which, on information and belief, P.G. participated are described more fully *supra*.

### COUNT XI: REQUEST FOR PERMANENT INJUNCTION

97.     The Estate re-alleges and incorporates herein the foregoing paragraphs.

98.     With regard to the Estate's copyright infringement claims, the Estate has been irreparably harmed by Bollin's infringement of the Estate's copyrights and will continue to be harmed by the infringement.  The Estate lacks an adequate remedy at law for the infringement to prevent future infringement as Bollin will continue to infringe the copyrights unless the Court order impoundment of the works and unless Bollin is enjoined by the Court.  Public policy and the public interest favor the enforcement and protection of the Estate's copyrights.  Therefore, pursuant to 17 U.S.C. §§ 502, 503 and FED. R. CIV. P. 65, the Estate seeks a permanent injunction prohibiting Bollin and P.G. and all persons acting in concert with them, as well as all persons under their direction, control, permission or authority from infringing on the Estate's copyrights and from disposing of, transferring, selling and/or exploiting the Vocal Tracks.

99.     With regard to the Estate's conversion claims the Estate has been irreparably harmed by Bollin's conversion of the Estate's property, namely the Vocal Tracks, and will continue to be harmed Bollin's conversion.  The Estate lacks an adequate remedy at law for the conversion to prevent future injury, as Bollin will continue to maintain illegal possession of the Vocal Tracks unless enjoined by the Court.  Public policy and the public interest favor the enforcement and protection of the Estate's property rights.  Therefore, pursuant to FED. R. CIV. P. 65, the Estate seeks a permanent injunction mandating that Bollin turn over the stolen Vocal Tracks to the care, custody, and control of the Estate.

## ATTORNEY'S FEES

100.     The Estate seeks an award of its reasonable attorney's fees incurred in connection with the adjudication of this dispute pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; 17 U.S.C. §§ 505 & 1203(b)(5); TEX. PROP. CODE § 26.013, and any other applicable provision.

## JURY DEMAND

101.     The Estate asserts its rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## PRAYER

102.     For the foregoing reasons, Plaintiff, the Estate of Melvin Noble, Jr., requests judgment against Defendants, Ray Gene Bollin, Jr. d/b/a Absolut Production Recording Studios and Purlie Gates a/k/a "P.G." for the following:

    a)  After notice and hearing, a preliminary and permanent injunction enjoining Defendant and all persons under his direction, control, permission or authority from disposing of, transferring, selling and/or exploiting the Vocal Tracks, Instrumental Tracks, Music Files, Musical Compositions and/or Unreleased Recordings;

    b)  Declaratory relief as set forth above;

c)  An award of actual damages;

d)  An award of consequential damages;

e)  An award of actual damages under 17 U.S.C. §§ 504(b) and 1203(c)(2), or statutory damages under 17 U.S.C. §§ 504(c) and 1203(c)(3);

f)  An award of actual damages and/or statutory damages under Tex. Prop. Code § 26.013;

g)  An award of exemplary and/or punitive damages for all claims for which such damages are authorized;

h)  An order requiring turnover or, in the alternative, impoundment of all misappropriated Vocal Tracks, Music Files, and Unreleased Recordings;

i)  Prejudgment and post-judgment interest as permitted by law; and

j)  Reasonable attorney's fees and costs in this action;

k)  Such other and further relief as the Court may deem just, proper or necessary under the circumstances.

**DATED:  October 11, 2023.**

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: */s/ Brent A. Turman*
       Brent A. Turman
       State Bar No. 24077506
       bturman@bellnunnally.com
       Troy L. Hales
       State Bar No. 24099011
       thales@bellnunnally.com

2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
Telephone:  (214) 740-1400
Telecopy:  (214) 740-1499

**ATTORNEYS FOR PLAINTIFF**
**THE ESTATE OF MELVIN NOBLE, JR.**