# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ESTATE OF MELVIN NOBLE, JR., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:23-cv-716 |
| RAY GENE BOLLIN, JR. d/b/a | § | Judge Mazzant |
| ABSOLUT PRODUCTION RECORDING | § | |
| STUDIOS, and PURLIE GATES a/k/a | § | |
| "P.G.," | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff Estate of Melvin Noble Jr.'s Motion for Summary Judgment (Dkt. #60), Defendants' Motion for Summary Judgment (Dkt. #122), Plaintiff's Motion for Leave to File Supplemental Briefing & Evidence in Support of Plaintiff's Motion for Summary Judgment and Plaintiff's Response to Defendants' Motion for Summary Judgment (Dkt. #188), Plaintiff's Motion to Strike Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Sur-Reply (Dkt. #103), and Defendants' Motion to Substitute Exhibit Attachments (Dkt. #120). Having considered the Motions, the relevant pleadings, and the applicable law, the Court finds as follows:

1. Plaintiff Estate of Melvin Noble Jr.'s Motion for Summary Judgment (Dkt. #60) should be **GRANTED in part** and **DENIED in part**;

2. Defendants' Motion for Summary Judgment (Dkt. #122) should be **DENIED**;

3. Plaintiff's Motion for Leave to File Supplemental Briefing and Evidence in Support of Plaintiff's Motion for Summary Judgment and Plaintiff's Response to Defendants' Motion for Summary Judgment (Dkt. #188) should be **GRANTED**;

4.    Defendants' Motion to Substitute Exhibit Attachments (Dkt. #120) should be **GRANTED**; and

5.    Plaintiff's Motion to Strike Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Sur-Reply (Dkt. #103) should be **DENIED as moot.**

## BACKGROUND

### I.    Factual Background

This case arises in the wake of the November 2020 murder of hip-hop artist Melvin Noble, Jr., professionally known as Mo3 ("Mo3") (Dkt. #7 at ¶ 9). In 2019, Mo3 signed with a record label known as Empire Distribution, Inc. ("Empire") (Dkt. #7 at ¶ 13). Defendant Ray Bollin, Jr. ("Bollin") is an audio technician and owner of Absolut Production Recording Studios ("Absolut") (Dkt. #7 at ¶ 14).

For years, Mo3 used Bollin's studio to record his tracks (Dkt. #7 at ¶ 15). According to Mo3's Estate (the "Estate"), this process involved Mo3 recording "vocal performances (the 'Vocal Tracks') of his previously written musical compositions (the 'Musical Compositions') over previously created instrumental tracks that [Mo3] brought into the studio (the 'Instrumental Tracks')" (Dkt. #7 at ¶ 15). The Estate contends that Bollin took on a limited role during these sessions, completing only the "purely technical tasks" of setting up the microphone and pushing the record button (Dkt. #7 at ¶ 15). The Estate argues that Mo3 directed and oversaw Bollin's completion of these tasks (Dkt. #7 at ¶ 15). Further, the Estate maintains that Bollin did not participate in any mixing or mastering[1] himself, and that he had nothing to do with the creation of

---

[1] As defined in the Estate's Amended Complaint, "mixing" is "when an engineer carves and balances the separate tracks in a session to sound good when played together" (Dkt. #7 at ¶ 15 n.2) (internal citations omitted). "Mastering," on the other hand, refers to "putting the finishing touches on a track by enhancing the overall sound, creating consistency across the album, and preparing it for distribution" (Dkt. #7 at ¶ 15 n.2) (internal citations omitted).

2

the Vocal Tracks (Dkt. #7 at ¶ 15). After Mo3 finished recording, the digital files containing the Vocal Tracks and Instrumental Tracks (the "Music Files") were either stored on Bollin's computer for later use or sent to engineers for mixing and mastering (Dkt. #7 at ¶ 15). The Estate insists that Bollin was fully compensated for each recording session and that, throughout the course of their relationship, Bollin never claimed an interest in Mo3's works (Dkt. #7 at ¶ 16).

Bollin, on the other hand, tells a different story. Bollin claims that he was far more involved than the Estate gives him credit for (Dkt. #123 at ¶ 14). Bollin asserts that he is "significantly more than an audio tech" (Dkt. #123 at ¶ 14). According to him, he served as a studio engineer on multiple projects and also served as the producer on the songs that are the subject of this dispute (Dkt. #123 at ¶ 14). According to his Answer, Bollin's "creative artistry along with the collaboration of [Mo3] in the creation of the subject songs were the reason for [the subject songs'] success" (Dkt. #123 at ¶ 14). Bollin argues that Mo3 never compensated him for the recording sessions (Dkt. #122 at ¶ 7). He further contends that he "claimed amounts due from [Mo3] for recording sessions and his interest in [Mo3's] sound recordings" (Dkt. #122 at ¶ 7).

After Mo3's death, on December 17, 2020, Collin County Probate Court No. 1 issued Letters of Temporary Administration designating Daniel White ("White") as the Administrator of Mo3's estate (Dkt. #60 at ¶ 10). According to White, his responsibilities included:

1.    To identify, collect and preserve all of [Mo3]'s intellectual property;

2.    To take possession and control of all of [Mo3]'s real and personal property; and

3.    To demand and recover [Mo3]'s assets from third parties.

(Dkt. #60-3) (cleaned up). The Estate suggests that White's efforts to discharge these duties were not fruitful because, although Bollin confirmed that he possessed the Music Files, he refused to turn them over to the Estate without a subpoena (Dkt. #60 at ¶¶ 11–13). Accordingly, White

obtained a subpoena from the probate court ordering Bollin to appear in court and turn over the Music Files (Dkt. #60 at ¶ 14). But White could never effectuate service on Bollin (Dkt. #60 at ¶ 14).

The Estate avers that, around the summer of 2021, Bollin contacted Empire to propose a sale of a series of unreleased Mo3 recordings that Bollin claimed to possess (the "Unreleased Recordings") (Dkt. #60 at ¶ 15). In return for the recordings, Bollin sought payment of unpaid studio fees (Dkt. #60 at ¶ 15). Ostensibly, discussions went stale until April 13, 2022, when Bollin's attorney, Raymond Mbala ("Mbala"), emailed Empire to request a face-to-face meeting (Dkt. #60 at ¶ 18). In his email, Mbala suggested a "joint release of a not-yet published Mo3 project" (Dkt. #60-12 at p. 14). A month later, in May of 2022, the Estate amended Mo3's recording agreement with Empire to allow for "the release of posthumous Mo3 music that [is] intended to feature previously unreleased material" (Dkt. #60 at ¶ 19).

Shortly after the Estate's amendment to Mo3's recording agreement, the Estate again heard from Mbala via email (Dkt. #60 at ¶ 20). Specifically, Mbala characterized Bollin's "historical position" in relation to Empire's business relationship with Mo3 as one that seeks "the fair and equitable distribution of the revenue that has been derived from the collective efforts of Mo3, Ray Bol[l]in p/k/a 'Drop,' and Absolut Productions Studios" (Dkt. #60-13 at p. 6). In the email, Mbala noted that he would send a proposed settlement soon, calibrated to fully compensate Mbala's clients for their contributions to Mo3's career from his first dealings with Absolut in the Fall of 2012 "through the time he . . . signed . . . with Empire" in 2019 (Dkt. #60-13 at pp. 6–7).

On September 19, 2022, Mbala submitted a "deal memo" outlining the proposed settlement agreement (Dkt. #60-13 at pp. 3–5). The deal memo proposed Bollin's transfer of

ownership of the Unreleased Recordings in exchange for:

1. $20,820 for "production" (allegedly consisting of recording, mixing, mastering and arrangement) and studio time;

2. $624,000 in "licensing fees" for [seventy-eight] "previously released songs" and $6,500 per recording for the Unreleased Recordings (the quantity of which remain[s] undisclosed)—plus a 25% royalty interest in all of the recordings;

3. "Back royalties" to be "paid retroactively from all sales, downloads, streaming platforms, etc." of the [seventy-eight] previously released recordings; and

4. Credits to include RIAA[2] Certifications, production and engineering credits, recognition in press releases, and a co-writer's credit.

(Dkt. #60 at ¶ 22).[3] On October 11, 2022, upon request from Empire's in-house counsel Mike Gallegus, Mbala submitted a list of fifty-one "unreleased single recordings" that "have been copyrighted by [Bollin], and all rights are reserved" (Dkt. #60 at ¶ 23; Dkt. #60-13 at p. 2). As the Estate observes in its Motion for Summary Judgment, "[a]t $6,500 per recording," Mbala's list "confirmed that Bollin sought an additional $331,500 for the Unreleased Recordings, a total of almost $1 million, plus back and future royalties" (Dkt. #60 at ¶ 23).

Finally, on August 24, 2023, Bollin's purported business manager, Purlie Gates a/k/a "P.G.," met the mother of one of Mo3's children, Jasmine Moore, at a restaurant in Richardson, Texas (Dkt. #7 at ¶ 36–37). There, according to the Estate, Purlie Gates "asked Moore to release the rights to [Mo3]'s Vocal Tracks that P.G. and/or Bollin had in their possession" (Dkt. #7 at ¶ 38). The Estate contends that Purlie Gates also asked Moore to agree to have both he and Bollin

---

[2] "RIAA" refers to the Recording Industry Association of America, which is a trade organization responsible for "protect[ing] the intellectual property and First Amendment rights of artists and music labels; conduct[ing] consumer, industry, and technical research; and monitor[ing] and review[ing] state and federal laws, regulations, and policies." *About RIAA*, RIAA, https://www.riaa.com/about-riaa/.

[3] The deal memo is set out in full in Dkt. #60-13 at pp. 3–5. The Court cites to the Estate's summary of the proposal for clarity's sake. Defendants do not dispute the Estate's summary of the proposal (Dkt. #98 at ¶ 22).

named as writers and co-producers of the tracks in their possession (Dkt. #7 at ¶ 38). According to the Complaint, Purlie Gates also asked Moore to allow he and Bollin to release the Music Files so that they could be compensated for the music (Dkt. #7 at ¶ 38). In return, Purlie Gates added that Moore's child would receive payments from the Music Files (Dkt. #7 at ¶ 38). The Estate avers that Purlie Gates only made this offer to Moore, and that he promised her that Mo3's "other children (and their mothers) would not get any money if she agreed (Dkt. #7 at ¶ 39).

## II.    Procedural History

In response to Bollin's alleged "[s]hakedown of the Estate" (Dkt. #60 at p. 12), the Estate commenced an action against Bollin on August 10, 2023 (Dkt. #1). On October 12, 2023—before Bollin answered—the Estate amended its Complaint to add Purlie Gates as a defendant (Dkt. #7). The Amended Complaint raises nine causes of action against Bollin and P.G. (collectively, "Defendants") arising from Bollin's purported infringement of the Estate's federally registered copyrights and his alleged breach of the contract between Mo3 and Bollin (Dkt. #7 at pp. 12–20). The Estate also seeks a declaratory judgment establishing the ownership of the Vocal Tracks and requests a permanent injunction "prohibiting Bollin and P.G. . . . from infringing on the Estate's copyrights and from disposing of, transferring, selling, and/or exploiting the Vocal Tracks" (Dkt. #7 at pp. 12–13, 19–20).

On December 11, 2023, Defendants filed their Answer (Dkt. #36). On March 25, 2024, Defendants filed their Amended Answer (Dkt. #50). Defendants' Answer, as amended, asserts five counterclaims against the Estate, including claims for breach of contract, unjust enrichment, conversion, accounting, and a claim under the Texas Deceptive Trade Practices Act ("DTPA") (Dkt. #50 at ¶¶ 103–36). On September 9, 2024, Defendants again amended their answer and

counterclaims to add two additional claims for copyright infringement and tortious interference with business relations (Dkt. #123 at pp. 13–21). Thus, Bollin claims his own copyright interest in the Vocal Tracks, which he maintains the Estate is infringing (Dkt. #123 at pp. 13–21).

On May 8, 2024, the Estate filed its Motion for Summary Judgment on all of its claims and all of Defendants' counterclaims (Dkt. #60). On August 5, 2024, Defendants filed their Response to the Estate's Motion (Dkt. #98). On August 12, 2024, the Estate filed its Reply (Dkt. #100). Defendants filed their Sur-Reply the next day (Dkt. #101). Then, on August 21, 2024, the Estate filed a Motion to Strike Defendants' Opposition to Plaintiff's Motion for Summary Judgment (Dkt. #103). The Motion raises a similar argument to the one the Estate raised in its Reply (Dkt. #100 at p. 1 n.1). Finally, on March 3, 2025, the Estate filed its Motion for Leave to File Supplemental Briefing & Evidence in Support of its Motion for Summary Judgment and its Response to Defendants' Motion for Summary Judgment (Dkt. #188).[4] Through it, the Estate seeks to supplement its Motion (Dkt. #60) and Response to Defendants' Motion (Dkt. #127) to address Defendants' newly amended counterclaims (Dkt. #123 at ¶¶ 103–08, 132–46) (adding counterclaims for copyright infringement and tortious interference with prospective business relations). Specifically, the Estate asks the Court to supplement the summary judgment record with excerpts from Bollin's deposition and evidence elicited in the Estate's inspection of the Music

---

[4] The Court notes that, according to the Amended Scheduling Order, the deadline for the parties to submit a motion for leave to file supplemental summary judgment briefing and evidence was February 21, 2025 (Dkt. #165 at p. 2). Thus, at first blush, the Estate's March 3 request for leave may seem untimely (Dkt. #188). However, the Estate initially timely filed its Motion for Leave on February 21, 2025 (Dkt. #181). However, due to a filing deficiency, the clerk's office required the Estate to refile (*See* Dkt. #181; Dkt. #183; Dkt. #188). Consequently, the Court will treat the Estate's Corrected Motion as timely filed (Dkt. #188).

Files that Bollin deposited with the Court, both of which occurred after the dispositive motion deadline (Dkt. #188; Dkt. #42 at p. 2).

On February 16, 2024, Defendants filed a Rule 12(b)(6) Motion to Dismiss all of the Estate's eleven causes of action for failure to state a claim upon which relief could be granted (Dkt. #43). On March 6, 2024, Defendants amended their Motion to Dismiss due to a deficiency in the signature line of the original Motion (Dkt. #45). On September 6, 2024, the Court denied Defendants' Motion to Dismiss (Dkt. #112). In doing so, the Court instructed that "the better way to handle [Defendants' arguments] is through a motion for summary judgment" (Dkt. #112). Thus, on September 18, 2024, Defendants filed their Motion for Summary Judgment on the Estate's claims and Defendants' counterclaims (Dkt. #122). By and large, Defendants' Motion for Summary Judgment is the same as its Motion to Dismiss, except that the former asks the Court to grant Defendants summary judgment because "Plaintiff fails to state a claim for which relief can be granted" (Dkt. #122 at p. 6). In other words, Defendants claim an entitlement to summary judgment under the Rule 12(b)(6) standard, instead of the Rule 56 standard. The only substantive differences are that the instant Motion does not include any discussion of the Estate's conversion claim, and it adds subsections discussing copyright registration and "work made for hire" (*Compare* Dkt. #43 *with* Dkt. #122). That Defendants have merely repackaged the same arguments they advanced at the 12(b)(6) stage as a Motion for Summary Judgment does not cure the Motion's fatal defect—it includes the wrong legal standard.[5] Alas, to give Defendants the benefit of the

---

[5] The Court recognizes that its Order denying Defendants' Motion to Dismiss could be misread to suggest that Defendants only needed to refile (Dkt. #112). The Court intended for Defendants to re-raise their arguments under the appropriate Rule 56 standard. *Compare* FED. R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") *with* FED. R. CIV. P. 12(b)(6) (allowing a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted).

doubt, and in the interest of judicial economy, the Court will construe Defendants' arguments as having been raised under the appropriate summary judgment standard when possible. Given the obvious overlap between the Estate's and Defendants' Motions, the Court will handle them together in this Order.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Federal Rule of Civil Procedure 56(a) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears

the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Before addressing the merits of the parties' cross-motions for summary judgment, the Court must first address the three related motions that impact the disposition of the summary judgment motions. First, the Court will address Defendants' Motion to Substitute Exhibit Attachments (Dkt. #120). Second, the Court will handle Plaintiff's Motion to Strike Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Sur-Reply (Dkt. #103). Third, the Court will wrestle with Plaintiff's Motion for Leave to File Supplemental Briefing and Evidence in Support of Plaintiff's Motion for Summary Judgment and Plaintiff's Response to Defendants' Motion for Summary Judgment (Dkt. #188). Then, the Court will continue to the merits.

## I.    Motion to Substitute Exhibit Attachments (Dkt. #120)

The Court begins with Defendants' Motion to Substitute Exhibit Attachments and L.R. CV-7 Certificate (Dkt. #120). Through it, Defendants seek to correct errors in their summary judgment evidence (Dkt. #120). Specifically, Defendants submitted multiple defective affidavits to accompany their Response to the Estate's Motion for Summary Judgment (Dkt. #98-3). Those affidavits are either out of order, improperly notarized, improperly sworn, or unsigned in violation of 28 U.S.C. § 1746 (Dkt. #98-3). Accordingly, in support of their Motion to Substitute, Defendants have submitted corrected exhibits to remedy the defects in the earlier-submitted affidavits (Dkt. #120-2; Dkt. #120-3; Dkt. #120-4; Dkt. #120-5). These substitute exhibits are properly signed, notarized, sworn, and appear in the correct order (Dkt. #120-2; Dkt. #120-3; Dkt. #120-4; Dkt. #120-5). In the Fifth Circuit, "[w]hen summary judgment is inappropriate because the supporting or opposing materials are improper, the district court has ample discretion to call upon the parties to remedy the defects, by submitting supplemental affidavits or otherwise." *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980). The Court will exercise that discretion here and grant Defendants' Motion to Substitute Exhibit Attachments (Dkt. #120).

## II.    Motion to Strike (Dkt. #103)

Next, the Court evaluates Plaintiff's Motion to Strike (Dkt. #103). The Estate's Motion echoes an argument that the Estate raised in a passing footnote in its Reply in Support of its Motion for Summary Judgment (Dkt. #100 at p. 1 n.1). There, the Estate argued that "Defendants filed their response (Dkt. #98) on August 5, 2024, sixty-eight days late, without seeking a continuance or leave to file a response after the deadline" (Dkt. #100 at p. 1 n.1). Wrong. On May 25, 2024—four days before the May 29, 2024, deadline—Defendants filed their Motion for Extension of Time

to Respond to the Estate's Motion for Summary Judgment (Dkt. #67). Undeterred, in its Motion to Strike, the Estate maintains that "[w]hile Defendants filed a motion for extension of time to respond (Dkt. #67), they never obtained a ruling on that motion, which remains pending" as of the date of the motion (Dkt. #103 at ¶ 3). Accordingly, the Estate urges the Court to strike Defendants' Response and Sur-Reply as untimely (Dkt. #103 at pp. 2–4). But on September 5, 2024, the Court issued an Order granting Defendants' Motion for Extension of Time to Respond (Dkt. #111). In doing so, Defendants' Response was deemed timely filed (Dkt. #111).

The Estate also seeks to strike Defendants' Response because the exhibits accompanying Defendants' Response are unsigned and out of order (Dkt. #103 at pp. 4–7; *see* Dkt. #98-3). However, having granted Defendants' Motion to Substitute Exhibit Attachments and L.R. CV-7 Certificate (Dkt. #120), the Court need not take up this issue. *See supra* Section I. Thus, the Court finds that the Estate's Motion to Strike (Dkt. #103) should be denied as moot.[6]

### III.    Motion to File Supplemental Briefing and Evidence (Dkt. #188)

The Court now turns to the Estate's motion to supplement the summary judgment record (Dkt. #188). Through it, the Estate seeks to supplement its Motion for Summary Judgment (Dkt. #60) and its Response to Defendants' Motion for Summary Judgment (Dkt. #127). The Estate

---

[6] In its Motion to Strike, the Estate also challenges the competency of Defendants' summary judgment evidence, arguing that the documents attached to Defendants' Response are "inadmissible" (Dkt. #103 at pp. 4–7; Dkt. #125 at pp. 4–6). To the extent that the Court relied on any evidence in determining the Estate's Motion for Summary Judgment (Dkt. #60), the Estate's Motion to Strike (Dkt. #103 at pp. 4–7) is denied. *Cf. Turner*, 476 F.3d at 343 (citations omitted) (noting that at the summary judgment stage, the district court must consider all of the evidence in the record to determine whether there is a dispute as to any material fact and draw all reasonable inferences in the light most favorable to the nonmoving party); *see also Maurer v. Indep. Town*, 870 F.3d 380, 385 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form," but "need only be *capable* of being presented in a form that would be admissible in evidence.") (cleaned up).

In a separate Order (Dkt. #206), the Court has struck Defendants' expert, Virgil Roberts, and, therefore, it is inappropriate to consider any facts derived from that expert in ruling on the instant cross-motions for summary judgment. The Court's holding in this Order is not based whatsoever on Roberts's potential testimony. Indeed, there are no facts in the record from that expert for the Court to consider.

wishes to do so for two reasons (Dkt. #188). First, it avers that the supplemental evidence will address the new claims that Defendants raised in their amended counterclaim, which Defendants added after the Estate filed its Motion for Summary Judgment (Dkt. #188 at p. 3) (citing Dkt. #123 at ¶¶ 103–08, 132–46). Second, the Estate contends that leave is proper to supplement the summary judgment record with newly discovered evidence that came to light after the Estate filed its Motion for Summary Judgment (Dkt. #188 at p. 3). Specifically, the Estate requests leave to add five supplemental exhibits to the summary judgment record:

1.    [E]xcerpts of the deposition transcript of Defendant Bollin;

2.    Defendant Bollin's Responses to the Estate's Third Set of Interrogatories, dated February 17, 2025;

3.    [E]xcerpts from Bollin's testimony from injunction hearing;

4.    [E]xcerpts of the deposition transcript of Brandon Rainwater; and

5.    [E]mail from counsel for Defendants titled "Re: List of all songs titles in depute [sic]," dated Jan. 24, 2025 at 2:07 p.m.

(Dkt. #183 at pp. 2–3). As the Court previously addressed, the Estate timely filed its motion for leave in compliance with the Court's scheduling order, which the Court amended to extend the discovery deadline from July 17, 2024, to February 14, 2025 (*Compare* Dkt. #42 at p. 2 *with* Dkt. #165 at p. 2). *See supra* note 4. As a result, the new discovery deadline fell more than nine months after the May 8, 2024, dispositive motion deadline (*Compare* Dkt. #43 at p. 2 *with* Dkt. #165 at p. 2). In anticipation of the new evidence that may arise during that nine-month gap before the close of discovery, the Court's Amended Scheduling Order allows the parties to submit a motion for leave to file supplemental briefing and evidence in support of motions for summary judgment (Dkt. #165 at p. 2). Hence, the instant Motion (Dkt. #188). Exercising its "broad discretion [to] control[] its own docket," and considering the Court's ability under Rule 56 to "give [parties] an opportunity to properly support or address the fact" in a summary judgment motion, the Court

finds that leave is proper here. *See Edwards v. Cass Cty., Tex.*, 919 F.2d 273, 275 (5th Cir. 1990); FED. R. CIV. P. 56(e)(1). Finally, by granting leave to supplement the summary judgment record, the Court deems the Estate's Supplemental Briefing filed (Dkt. #183).

## IV.    Summary Judgment Merits

Shifting course, the Court will now engage with the merits of the cross-motions for summary judgment. But first, a brief review. On May 8, 2024, the Estate filed its Motion for Summary Judgment, wherein it claims an entitlement to judgment as a matter of law on all ten of its claims and each of Defendants' five counterclaims (Dkt. #60 at pp. 6–7). Having determined that leave is proper to supplement the summary judgment record, the Court must also consider the Estate's supplemental briefing, in which the Estate also prays for summary judgment on Defendants' copyright infringement and tortious interference claims (Dkt. #183; Dkt. #123). *See supra* Section III. Thus, the Estate seeks summary judgment on seventeen claims, which can be distilled into four general categories: (1) those regarding the copyright; (2) those regarding breach of contract or quasi-contract; (3) those related to business torts; and (4) those related to the DTPA (*See* Dkt. #60 at pp. 6–7; Dkt. #183 at p. 2). Conveniently, Defendants likewise claim an entitlement to summary judgment on all of the Estate's claims and all of Defendants' counterclaims (Dkt. #122). Thus, the Court will examine the record to determine if a fact issue exists on any of the claims on either side. FED. R. CIV. P. 56(a). As set forth below, a genuine issue of material fact exists as to those actions that are anchored in the copyright and contract claims, as well as the competing business tort claims. As to Defendants' DTPA and unjust enrichment claims, however, no genuine issue of material fact exists.

### A.    Copyright Claims

The Court begins with the causes of actions rooted in copyright. As mentioned, both the

Estate and Defendants seek summary judgment on eleven issues related to copyright:

1.    The Estate's claim for copyright infringement;

2.    The Estate's request for declaratory judgment on copyright authorship or ownership;

3.    The Estate's DMCA claim;

4.    The Estate's conversion claim;

5.    The Estate's claim for unauthorized use of name and likeness under TEX. PROP. CODE § 26.013;

6.    The Estate's claim against P.G. for aiding and abetting Bollin's alleged conversion;

7.    The Estate's claim against P.G. for aiding and abetting Bollin's alleged copyright infringement;

8.    The Estate's claim against P.G. for aiding and abetting Bollin's alleged unauthorized use of name and likeness under TEX. PROP. CODE § 26.013;

9.    Defendants' conversion claim;

10.    Defendants' claim for accounting; and

11.    Defendants' claim for copyright infringement.

(Dkt. #60; Dkt. #183). Each of these claims, when viewed from both sides of the proverbial "v,"

hinge on whether Bollin has a cognizable copyright interest in the Vocal Tracks or Music Files. To

that end, Bollin contends that he is a co-author of the "Released and Unreleased Music" and,

therefore, possesses a copyright interest under 17 U.S.C. § 201(a) (Dkt. #122 at p. 7). In support,

he cites to the copyright registration that he possesses for a group of ten unpublished Mo3 works

(Dkt. #122-8 at p. 2). Bollin contends that, under Fifth Circuit precedent, his certificate of

registration constitutes "prima facie evidence both that [the] copyright is valid and that [Bollin]

owns the copyright" (Dkt. #122 at p. 10) (quoting *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141

(5th Cir. 2004)). Unsurprisingly, the Estate disagrees (Dkt. #60 at pp. 17–21). For its part, the

Estate maintains that Mo3 "was the sole author and owner of the Vocal Tracks, . . . despite Bollin's falsified copyright records" (Dkt. #60 at pp. 18–19). Thus, the Estate submits that it has successfully rebutted the presumption of ownership and validity that arose from Bollin's copyright registrations (Dkt. #60 at pp. 17–21).

The Estate continues to support its position in its Supplemental Briefing and Evidence in Support of its Motion for Summary Judgment (Dkt. #183). There, the Estate expands on its initial summary judgment arguments by directing the Court to new evidence that the Estate discovered during Bollin's deposition and during the inspection of the Vocal Tracks on file with the Court (Dkt. #183 at p. 3). The Estate argues that "[b]ecause Bollin filed for copyright protection of the Music Files but not the Vocal Tracks," his presumptively valid copyright registration only covers the former, not the latter (Dkt. #183 at pp. 3–4). So, the argument goes, the Court should grant summary judgment for the Estate, at least on its claim for copyright infringement of the Vocal Tracks, because Bollin does not hold a copyright registration on the Vocal Tracks, nor did he co-author them (Dkt. #183 at p. 4). Yet, while the Estate minimizes Bollin's contributions to the Vocal Tracks to "press[ing] record" during Mo3's recording sessions, Bollin insists that he played a more active role in the process (Dkt. #183 at p. 4; Dkt. #122; Dkt. #98 at pp. 15–18). In fact, the affidavit he submitted alongside his Response to the Estate's Motion for Summary Judgment indicates that he took on a more involved role in editing and producing the Vocal Tracks than simply "press[ing] record" (Dkt. #120-3; Dkt. #183 at p. 4). In the Court's view, Bollin's level of involvement in the production, editing, mixing, mastering, and recording process for the Vocal Tracks is rife with fact issues for the jury to determine at trial. As such, it would be improper to grant summary judgment on the authorship of the Vocal Tracks at this stage.

After a careful review of the entire summary judgment record and the parties' arguments, the Court is not convinced that either party has met its burden to demonstrate the absence of a material fact issue that entitles either party to judgment as a matter of law on copyright ownership. Indeed, this case is laden with fact issues for the jury to determine. And just as one rotten apple spoils the whole barrel, so too does one fact issue preclude summary judgment on all related claims. Here, the rotten apple is the looming question of copyright ownership, which neither party has satisfactorily proven to the Court. Thus, the proverbial "barrel" of related claims—those claims that rely on an affirmative answer to the ownership question—must likewise proceed to trial. Consequently, the Court denies the Estate's and Defendants' cross-motions for summary judgment (Dkt. #60; Dkt. #122) to the extent that they claim an entitlement to judgment as a matter of law on the eleven claims listed above. *See supra* at 14.

### B.    Contract Claims

Turning to the parties' breach of contract claims, the summary judgment record contains fact issues that prevent the Court from granting summary judgment for either party. The Court need look no further than the inconsistency in the Estate's briefing on the issue (*Compare* Dkt. #60 at p. 23 *with* Dkt. #60 at p. 30). In support of its own breach of contract claim, the Estate insists that "the parties entered valid and enforceable oral contracts," which Bollin allegedly breached (Dkt. #60 at p. 23). Yet just six pages later in the same Motion, the Estate claims that, when Bollin seeks to enforce his end of the contract, "the alleged agreement between Bollin and the Estate and/or Noble is unenforceable" under the Texas Statute of Frauds (Dkt. #60 at p. 30). The Estate classifies this inconsistency as "pleading in the alternative" (Dkt. #100 at p. 4). The Court views it as a fact issue. Summary judgment is not warranted on the breach of contract claims.

Defendants' unjust enrichment claim, however, does not fare so well. Defendants assert a counterclaim that "[b]y diverting and unduly retaining to themselves royalties and other compensation for Defendant Bollin's songs, Plaintiffs were unjustly enriched to the detriment of Defendant Bollin" (Dkt. #123 at p. 14). But as the Estate correctly observes, federal copyright law preempts claims for unjust enrichment "to the extent they are based on a . . . violation of an exclusive right protected by the copyright law" (Dkt. #60 at p. 30). *Recursion Software, Inc. v. Interactive Intel., Inc.*, 425 F. Supp. 2d 756, 769 (N.D. Tex. 2006); *see also Mapp v. UMG Recordings, Inc.*, 310 F. Supp. 3d 743, 752–53 (M.D. La. 2018) ("As numerous courts within the Fifth Circuit have held, . . . similar claims concerning the copying and distribution of copyrighted work are preempted because such claims are typically 'qualitatively equivalent' to a cause of action for copyright infringement."); 17 U.S.C. § 301. Here, Defendants' unjust enrichment claim is based on "an exclusive right protected by the copyright law"—namely, the payment of royalties and other compensation to the Estate for Bollin's allegedly copyrighted songs. *See* 1 NIMMER ON COPYRIGHT § 1.15(G) (2025) ("[A] state-law cause of action for unjust enrichment or quasi contract should be regarded as an 'equivalent right' and, hence, preempted insofar as it applies to copyright subject matter."). Consequently, summary judgment is warranted on Defendants' claim for unjust enrichment because it is preempted by copyright law.

### C.    Business Tort Claims

Next, the Court looks to the competing tortious interference claims. The Estate brings its own claim for tortious interference, arguing that Defendants intentionally interfered with the Estate's contractual relationships with Empire (Dkt. #7 at pp. 17–18). The Estate claims that Defendants interfered with the Estate and Empire's business and contractual relationships in three

ways (Dkt. #7 at pp. 17–18). First, it argues that Defendants "attempt[ed] to do an end-run around the Estate and reach an agreement with Empire regarding the Music Files" (Dkt. #7 at pp. 17–18). Second, it contends that Defendants "maintain[ed] possession of the Music Files without the Estate's authorization" (Dkt. #7 at pp. 17–18). Finally, the Estate avers that Defendants "s[ought] to obtain a release of rights from [Jasmine] Moore," the mother of Mo3's children (Dkt. #7 at pp. 17–18). The Estate seeks summary judgment on its tortious interference claim and argues that Defendants were aware of Mo3's contract with Empire and willfully and intentionally interfered with the contract to the Estate's detriment (Dkt. #60 at pp. 26–27). However, at this stage, the Court is not convinced that the Estate has demonstrated the absence of a fact issue on their tortious interference claim. Indeed, the jury must determine the level of Defendants' knowledge of the Mo3-Empire contract and whether they acted willfully and intentionally to interfere with the agreement. Accordingly, the Estate is not entitled to summary judgment on its tortious interference claim.

The same holds true for Defendants' tortious interference claim, which it added after the Estate filed its Motion for Summary Judgment (Dkt. #60; Dkt. #123). Defendants' newly-added claim asserts that the Estate consciously interfered with the potential business relationship between Bollin and Empire (Dkt. #123 at p. 13). Due to Defendants' late amendment to their Answer and Counterclaim, the Estate filed its Motion to Supplement the summary judgment record to address Defendants' new tortious interference claim (Dkt. #123 at p. 13; Dkt. #188; Dkt. #183 at pp. 14–16). In its Supplement, the Estate submits that "Defendants have offered no . . . evidence showing Bollin engaged in anything other than mere conversations with Empire" and, thus, summary judgment for the Estate is warranted on Defendants' claim (Dkt. #183 at p.

19

15). Further, the Estate challenges Defendants' summary judgment evidence on the Estate's knowledge of Bollin's prospective business relationship with Empire, the Estate's alleged tortious conduct, and damages (Dkt. #183 at p. 15). Again, at this stage, the Court is not convinced that the Estate has carried its burden to demonstrate that no issue of material fact remains on Defendants' tortious interference claim. Thus, its Motion for Summary Judgment (Dkt. #183) on Defendants' claim must fail.

### D.    DTPA Claim

Finally, the Court turns to Defendants' DTPA claim, which the Estate moves for summary judgment on. Defendants' Corrected Answer and First Counterclaim asserts a counterclaim under the Texas DTPA, asserting that the Estate "engage[d] in false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty" (Dkt. #36 at p. 16). The Estate moves for Summary Judgment on Defendants' DTPA claim, arguing that Defendants' claim was not cognizable because, among other things, Defendants were not "consumers" under the statute (Dkt. #60 at p. 34). On September 19, 2024, Defendants amended their Answer and Counterclaims and removed the DTPA claim (*Compare* Dkt. #36 *with* Dkt. #123). Defendants' only reference to the DTPA in their live Answer and Counterclaim is a listed defense that states "Estate's claims are barred, in whole or in part, because the Estate has violated the Texas Deceptive Trade Practices Act" (Dkt. #123 at p. 3). Accordingly, the Estate's Supplement claims that Defendants abandoned their DTPA counterclaim and appears to question whether the DTPA constitutes a proper basis for any claim against the Estate (Dkt. #183 at p. 20).

At the outset, the Court agrees that Defendants' latest amendment to their Answer and Counterclaim—which dropped their DTPA claim—amounts to abandonment of their DTPA

claim (*Compare* Dkt. #36 *with* Dkt. #123). *Hamlett v. Ashcroft*, No. CIV.A.3:03-CV-2202-M, 2004 WL 813184, at *6 (N.D. Tex. Apr. 14, 2004), *report and recommendation adopted,* No. CIV.A. 303CV2202M, 2004 WL 1074028 (N.D. Tex. May 11, 2004) ("A party may abandon a claim if the party fails to sufficiently incorporate, attach, or reallege the claim in an amended pleading."); *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985) ("[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading.").

More substantively for purposes of summary judgment, as to Defendants' use of the DTPA as a defense, the Court agrees with the Estate that Defendants have presented *no* evidence that the Estate engaged in a false, misleading, or deceptive act that entitles Defendants to recovery under the DTPA. Indeed, Defendants' Answer and Counterclaim is devoid of any reference whatsoever to the DTPA beyond its threadbare accusation that the Estate violated it (Dkt. #123). Defendants have presented no evidence in support of their claim (Dkt. #123; Dkt. #98 at pp. 27–28). Without more, the Court must grant the Estate's Motion for Summary Judgment on Defendants' DTPA claim (Dkt. #60 at p. 34; Dkt. #183 at p. 20).

Finally, the Court notes that its analysis above focuses more on the arguments raised in the Estate's Motion for Summary Judgment (Dkt. #60; Dkt. #183). Defendants' summary judgment briefing raised few independent meritorious points, if any (Dkt. #122). To the extent that any argument remains unaddressed by the foregoing, the Court rejects those arguments because, under the proper standards of review, a genuine issue of material fact exists on each of Defendants' bases for summary judgment (Dkt. #122). Accordingly, Defendants' Motion for Summary Judgment (Dkt. #122) should be denied.

## CONCLUSION

The Court therefore **ORDERS** as follows:

1.   Plaintiff Estate of Melvin Noble Jr.'s Motion for Summary Judgment (Dkt. #60) is hereby **GRANTED in part** and **DENIED in part**;

    a.   The Estate's Motion for Summary Judgment (Dkt. #60) on Defendants' unjust enrichment and DTPA claims is **GRANTED**;

    b.   The Estate's Motion for Summary Judgment (Dkt. #60) on all of its remaining claims is **DENIED**;

2.   Defendants' Motion for Summary Judgment (Dkt. #122) is hereby **DENIED**;

3.   Plaintiff's Motion for Leave to File Supplemental Briefing and Evidence in Support of Plaintiff's Motion for Summary Judgment and Plaintiff's Response to Defendants' Motion for Summary Judgment (Dkt. #188) is hereby **GRANTED**;

4.   Defendants' Motion to Substitute Exhibit Attachments (Dkt. #120) is hereby **GRANTED**; and

5.   Plaintiff's Motion to Strike Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Sur-Reply (Dkt. #103) is hereby **DENIED as moot.**

**IT IS SO ORDERED.**

**SIGNED this 21st day of March, 2025.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE